IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 06-cv-01632-WDM

DANNY R. FERNANDEZ,

 Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

 Defendant.

## MEMORANDUM OPINION AND ORDER

Miller, J.

 Plaintiff Danny R. Fernandez (Fernandez) appeals the denial of his application for disability insurance benefits by defendant Michael J. Astrue, Commissioner of Social Security (Commissioner). I have considered the parties' written and oral arguments, as well as the evidence contained in the certified administrative record. For the reasons that follow, I conclude this case should be remanded to the Commissioner.

Background

 Fernandez was born in January, 1966. Administrative Record at 29. His insured status date for receipt of benefits is December 31, 1996. *Id.* at 633-34. He completed high school and has worked as an auto parts warehouse laborer, forklift operator, farm laborer, and doing labor for a beer manufacturer/distributor. *Id.* at 43, 289.

 Fernandez filed an initial application in 1994, claiming a disability onset date of February 7, 1991, as a result of a series of on-the-job injuries to his shoulder and knee, with resulting associated back pain. *Id.* at 29. After a hearing, the first ALJ issued an

unfavorable decision on April 1, 1996. *Id.* at 16-25. On appeal to this court, I remanded the case in a decision issued April 20, 2000, because of new evidence and the need to develop the record further. After the hearing, Fernandez submitted a functional capacity evaluation (FCE) from March 13, 1996 and a July 1996 psychological evaluation by Dr. Steven D. Martin, diagnosing depression, to the Appeals Council. *Id.* at 260-77. A second hearing was held in 2002 and another unfavorable decision issued May 14, 2002. *Id.* at 336-40. On appeal to the district court, the Honorable Marcia S. Krieger again remanded the case because, *inter alia*, the ALJ's decision did not reveal whether the ALJ had actually considered the 1996 FCE or the effect of Fernandez's mental impairments as instructed by my original remand order. *Id.* at 584-613. A third hearing was held on February 8, 2006. *Id.* at 624-90. At the hearing, a new onset date of March 13, 1996 was stipulated. *Id.* at 633-34. Another unfavorable decision was issued March 24, 2006. *Id.* at 562-70. The Appeals Council declined review on June 15, 2006. *Id.* at 546-49.

Medical History

Fernandez had a surgery on his left shoulder in June 1991. He had numerous surgeries on his left knee between 1980 and 1996, before the date of his last insurance eligibility. He had several surgeries on that knee thereafter. As discussed above, he was diagnosed with depression in 1996 and received some treatment through 1997. He also claims back and other chronic pain, although the record does not reveal any disc or spine disorders that could cause back pain; his doctors hypothesize that additional strain is put on his back as a result of his knee problems and uneven gait/weightbearing.

Fernandez's shoulder surgery, to address instability and trauma after an on-the-job injury, was performed by Dr. Stewart Weinerman in 1991. *Id.* at 100. In 1991, he had an

ACL reconstruction surgery on his knee, with the surgery performed by Dr. Keith Fujisaki. *Id.* at 117.  Fernandez appeared to recover fairly well from these surgeries, but reported some popping and the sensation of instability throughout 1992.  *Id.* at 137, 141, 149.  Nonetheless, in a treatment note from September 1992, he reported that he was able to play volleyball again.  *Id.* at 149.  Dr. Fujisaki prescribed a knee brace around this time. *Id*.  In January 1993, Dr. Fujisaki judged Fernandez to be at MMI with a 6% whole person impairment.  *Id.* at 150.  Fernandez reported back pain around this time, which Dr. Fujisaki attributed to the knee and use of the knee brace.  *Id.* at 151.

In May 1993, Dr. Weinerman performed another surgery on the right knee, to repair a torn graft, instability, and torn meniscus.  *Id.* at 153. Fernandez had physical therapy for several months thereafter.  *Id.* at 161-71.  Dr. John Papilion examined Fernandez in February 1994 and noted that the graft had apparently failed, making the knee very unstable.  He recommended either living with the limitations or attempting another reconstruction, which would require several surgeries over the next two years to remove the failed hardware and grafts, healing, and then repeating the reconstruction.  *Id.* at 208-09.  Fernandez elected surgery, so Dr. Weinerman performed a revision ACL reconstruction on May 13, 1994.  *Id.* at 174. Approximately four months after the surgery, Dr. Weinerman reported to the insurance company that Fernandez was doing well, the knee was more stable, and Fernandez could start doing activities including weightlifting, walking, and bicycling.  *Id.* at 225.

A Residual Functional Assessment was completed by the SSA on May 18, 1994 and affirmed by Dr. George Twombly on October 11, 1994.  *Id.* at 50-57.  The RFC limited Fernandez to occasional lifting 20 pounds, frequent lifting 10 pounds, standing or walking

3

at least two hours a day, but with postural shifts as needed, sitting about six hours a day, unlimited pushing and pulling with his upper extremities, no repetitive foot controls with his right lower extremities, no climbing on ropes or ladders, occasional kneeling, crouching, and crawling, unlimited reaching with the right but no overhead reaching with his left upper extremity, and avoiding exposure to extreme cold and hazards. *Id.* at 51-55.

In September 1994, Dr. David Crosson performed a consultative examination of Fernandez. *Id.* at 226. He opined that Fernandez was limited to sedentary work, with no more than an hour of standing at a time and no lifting over 25 pounds. *Id.* at 229. Dr. Crosson noted that Fernandez had some shoulder pain but that otherwise his upper extremities were fine and that he was capable of performing regular activities of daily living. *Id.* Dr. Crosson also noted that Fernandez's right knee was unstable but that this was mitigated by the knee brace. *Id.* In December 1995, Dr. Weinerman declared Fernandez at MMI with a 35% impairment to the knee, 14% whole person impairment. *Id.* at 238. However, in July 1996, he revised that opinion and stated that he believed Fernandez was not yet at MMI. *Id.* at 281.

Fernandez's first hearing before the ALJ was in February 1996. *Id.* at 284. He testified about pain, but also reported doing a number of activities, including riding a bicycle, pheasant hunting, and walking for up to two hours at a time. *Id.* at 294, 297, 300, 311-12.

The March 1996 FCE was completed by a physical therapist. *Id.* at 270. She imposed a number of limitations, including infrequent standing (15-30 minutes at a time) and no kneeling or crawling on his right knee. *Id.* Because of the shoulder injury, she recommended no repetitive/sustained overhead or forward reaching. *Id.* at 271. She also

4

stated that Fernandez had put forward maximum voluntary effort and that the test results were valid and reliable. *Id*. The FCE included a one-hour limitation on sitting; it is unclear whether this meant one hour at a time or one hour out of an eight-hour work day. *Id*. at 273.

Fernandez had another surgery in mid-1996 to address instability in his right knee. *Id*. at 535. His recovery was apparently satisfactory. *Id*.

In March 1997, Dr. Kenneth Finn performed a consultative examination. *Id*. at 425. Fernandez complained of neck pain, shoulder pain, earache, low back pain, elbow and wrist pain, abdominal problems, and knee problems. *Id*. The physical examination revealed no abnormalities or spasms in the cervical spine, normal range of motion in elbows and wrists, some limits on range of motion in the left shoulder but no sign of impingement, some issues in the right SI joint because of uneven weight bearing, and knee issues. *Id*. at 425-26. Dr. Finn stated he could find no objective data to explain the alleged lumbar and other musculoskeletal pain and that Fernandez's complaints "are out of proportion to what is found on physical examination." *Id*. at 426.

Dr. Weinerman completed a form describing limits on Fernandez's ability to work on March 31, 1997. *Id*. at 531. He opined that Fernandez could return to work but was limited to sedentary work (including lifting 10 pounds maximum weight and carrying small items), could stand 0-2 hours/day, had no limits on sitting, could drive 1-3 hours/day, had no restrictions on repetitive grasping, pushing, pulling, fine manipulation, and could use his left leg for repetitive movement as in operating foot controls. *Id*. Fernandez was restricted from bending, squatting, kneeling, climbing, but could reach frequently. *Id*. In a letter dated February 1998, Dr. Weinerman recommended that Fernandez be further

evaluated for back problems; based upon an x-ray, Dr. Weinerman believed Fernandez could have degenerative disc problem at C6-7. *Id.* at 526. However, in another letter dated April 20, 1998, he stated that Fernandez's low back problems were probably caused by the knee, not any injury to the back. *Id.* at 525.

Dr. Weinerman completed another form assessing Fernandez's physical limitations in February 1999. *Id.* at 509. He again opines that Fernandez could return to sedentary work but could do no standing in a day, could sit without restrictions, could drive 10-30 minutes, had no restrictions on his upper extremities, but could not do repetitive activities with his right extremity. *Id.*

Fernandez received some vocational rehabilitation in 1998. *Id.* at 428-444. He was apparently interested in locksmithing but counseled that this might not be feasible if he stayed in Lamar, where he lived at the time. *Id.* at 443. A note from July 1998 recites that vocational testing "reveals a basic disinterest in the world of work," negative attitude, and no ownership in the process of trying to obtain alternative work or training. *Id.* at 479-80. Fernandez had an arthroscopy in July 1998 and another surgery, a meniscus transplant, in October 1998; as a result the vocational counseling was put on low active status for approximately six weeks. *Id.* at 475, 515, 520. Some efforts were made to assist him in getting a job as a recruiter. *Id.* at 471. In January 1999, notes from the vocational rehabilitation service indicated that Fernandez intentionally performed poorly in a mock interview, giving "ridiculous answers," and was negative about further vocational exploration, possibly because further surgery was being contemplated. *Id.* at 441. His attitude seemed to improve somewhat in February 1999, *id.*, but in March stated he was not interested in further vocational training because he was in too much pain. *Id.* at 440.

6

A vocational evaluation dated October 2, 2000 opined that Fernandez was essentially unemployable because of his lack of skills, injuries, work restrictions, unwillingness to relocate from the Lamar, Colorado area (which has a limited labor market), and negative attitude with his previous vocational rehabilitation services.  *Id.* at 481-86.

Dr. Martin's July 1996 psychological evaluation diagnosed Fernandez with Major Depression, Moderate, Pain Syndrome with Psychological Factors, and a GAF score of 60.  *Id.* at 265.  Dr. Martin noted that Fernandez attributed all his problems to his injury, that he had not adjusted to his disability, and was suffering from depression exacerbated by heavy alcohol use.  *Id.*  At the time of the evaluation, Fernandez refused intervention.  *Id.*

Fernandez apparently later changed his mind and began seeing Dr. Jose Vega in April 1997.  *Id.* at 500.  Dr. Vega noted that Fernandez was having a difficult time accepting his disability and was extremely discouraged by the unavailability of vocational training as a locksmith.  *Id.* at 500-1.  Dr. Vega recommended therapy to address the depression.  *Id.* at 501.  Dr. Vega treated Fernandez through 1997 and 1998 and intermittently until January 2000.  *Id.* at 489-98.  In a letter to the insurance company dated January 1998, Dr. Vega reported that Fernandez had improved psychologically.  *Id.* at 497.  In another letter dated March 13, 2000, Dr. Vega opined that Fernandez would need to be able to pace his activities at work because of pain, take rest periods for pain and for stress management, and should be slowly reintegrated into the work world.  *Id.* at 489-90.  In June 2000, a report from Dr. Martin indicated that Fernandez had "potentially borderline intellectual functioning" and that he was quite unhappy with his life since his

knee injury, although he found Dr. Vega's counseling to be helpful. *Id.* at 462. Fernandez was not interested in taking medication or continuing therapy to treat his mental issues. *Id.* Dr. Martin declared him at MMI with an impairment of approximately 15-20%. *Id.*

In a letter dated June 6, 2000, Dr. Weinerman declared Fernandez to be at MMI, with the following restrictions: sedentary work, no kneeling, squatting, running, climbing, loading, no excessive walking, standing, no ladders, no work from unrestricted heights, and no heavy labor lifting. *Id.* at 505.

At the 2002 hearing, Fernandez described having severe knee pain and taking Vicodin. *Id.* at 351-52. He denied that he had ever done any of the activities he described in the 1996 hearing, claiming that he had walked his dogs by driving and having them run alongside the car and went hunting by shooting from a vehicle. *Id.* at 360. He described previously taking anti-depressants but stopping because of the side effects. *Id.* at 364.

Administrative Proceedings

At the 2006 hearing, Fernandez's attorney and the ALJ discussed and identified the FCE and Dr. Vega's opinions and the need for these to be addressed. *Id.* at 628-32. Fernandez testified that he no longer takes prescription pain medication because of the cost but does take Aleve twice a day. *Id.* at 644, 668. He stated that he has not pursued indigent health care services in his area. *Id.* at 644. He testified that he can sit for 15-20 minutes, walk for 15 minutes, and does little housework. *Id.* at 646-53. Fernandez further testified that spends his day playing solitaire, playing games on the computer, and reading. *Id.* at 656. He uses a cane and brace for walking. *Id.* at 659. When questioned

8

by his own attorney, he testified that his knee pain was his most severe pain he had and that it never went away. *Id.* at 662. He stated that he needed to get up and down frequently to relieve the pain. *Id.* at 663. He stated that his hands were swelling up, but that he had not seen a doctor about it. *Id.* at 663. He testified that he needed to lie down five or six times throughout the day to elevate and ice his knee for pain relief, but that he did not sleep or nap during these times. *Id.* at 651, 663.

A VE testified in response to several questions posed by the ALJ. The questions were generally based on RFCs similar to the restrictions contained in the 1994 RFC by Dr. Twombly, Dr. Weinerman's 1997 restrictions, the 1996 FCE, and variations on these restrictions. The ALJ commented that the 1996 FCE, if construed to permit only one hour of sitting in a full day, would preclude all work. The VE identified several jobs in the economy that could be performed by individuals with the restrictions presented in some of the hypothetical questions.

The ALJ issued a decision on March 24, 2006. *Id.* at 562-70. The ALJ reviewed the case history, medical records, and hearing testimony and made the following findings:

1. Fernandez had not engaged in substantial gainful activity since February 7, 1991. *Id.* at 563.

2. Fernandez had severe impairments, specifically left shoulder instability and right knee instability status multiple surgical repairs, with attendant back pain. *Id.* at 564. The ALJ considered but declined to find a separate impairment from the low back pain since there was no objective medical evidence demonstrating a degenerative impairment. *Id.* He also declined to find that the depression was a severe impairment because the condition improved with treatment and Fernandez declined antidepressant medication. *Id.* at 564-65. However, the ALJ noted that all impairments, severe or not, would be considered. *Id.* at 565.

3. None of the impairments, alone or in combination, met the criteria of any

>       listed impairment.  *Id.* at 565.
>
> 4.    In determining Fernandez's residual functional capacity, the ALJ rejected Fernandez's reports of his pain and limitations based on credibility.  *Id.* at 566.  He noted that Fernandez had contradicted himself about how much he walked in the 1996 and 2002 hearings.  *Id.*  He also noted that Fernandez had testified in 1996 that he could sit for 2 hours before needing to stand but now claims to need to change positions every 20 minutes.  *Id.*  In light of the lack of objective evidence indicating a lumbar problem, and the opinion of a consulting physician that Fernandez reported pain out of proportion to his physical conditions, the ALJ rejected the testimony regarding Fernandez's inability to sit.  *Id.*  He also rejected the testimony regarding Fernandez's need to take several rest periods throughout the day, since there is no objective medical evidence supporting this need and no physician has ever suggested such a limitation.  *Id.*  The ALJ also relied on the reports of Fernandez's negative attitude in vocational rehabilitation.  *Id.*  Finally, the ALJ noted that Fernandez had reported playing volleyball in 1992 and in 1999 reported swimming as rehabilitation for his knee (indicating that he can engage in some physical activities).  *Id.*
>
> 5.    The ALJ found that, for the relevant time period, Fernandez had an RFC permitting sedentary work, standing/walking two hours a day, sitting six hours, never climbing ladders/ropes/scaffolds, occasionally climbing ramps/stairs, avoiding repetitive use of lower extremities to operate foot controls, avoiding concentrated exposure to extreme cold and environmental hazards, avoiding repetitive reaching or lifting with left upper extremity.  *Id.* at 567.  In making this determination, the ALJ gave great weight to Dr. Twombly's RFC, Dr. Weinerman's 1997 evaluation, and the consulting physician Dr. Crosson.  The ALJ gave less weight to Dr. Weinerman's limitations in 1999, as these were imposed shortly after a knee surgery.  The ALJ also gave little weight to the 2000 vocational assessment as it was long after the eligibility date and partially based on the alleged need to lie down.  *Id.* at 568.
>
> 6.    Fernandez was unable to perform his past relevant work.  *Id.* at 568.
>
> 7.    Based on the VE's testimony, there were jobs existing in significant numbers in the economy that Fernandez was capable of performing.  *Id.* at 568.

The Appeals Council denied a request for review, rendering the ALJ's

determination final for purposes of this appeal.

## Standard of Review

I review the Commissioner's decision to determine whether his factual findings are supported by substantial evidence in the record as a whole and whether he applied the correct legal standards. *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The commissioner must apply the correct legal standard, and must provide the court with a sufficient basis to determine that appropriate legal principles were followed. *Nielson v. Sullivan*, 992 F.2d 1118, 1119-1120 (10th Cir. 1993).

## Discussion

Fernandez makes three arguments on appeal: (1) that the ALJ's RFC is not based on substantial evidence; (2) the ALJ erred in his credibility determination; (3) the hypothetical questions did not match the RFC and so there is insufficient evidence of jobs Fernandez could perform.

1. <u>RFC Finding</u>

Fernandez argues that the ALJ erred in determining his RFC because, *inter alia*, the ALJ failed to consider the March 1996 FCE, which has twice been the reason for remanding the case. He argues that this FCE, if credited, would preclude all work. In response, the government argues that the ALJ implicitly considered the FCE by starting to use it as a hypothetical but then acknowledging at the hearing that the limits it describes would eliminate all work. I agree that the ALJ's failure to expressly mention this piece of evidence in his decision is somewhat astonishing in light of the two previous remands.

Although an ALJ is not required to discuss every piece of evidence, there must be some mention of significantly probative evidence that is rejected, as well as the controverted evidence the ALJ chooses not to rely upon. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Once again, because of this omission, I simply cannot determine whether the ALJ considered the FCE and, if he rejected it, the reasons for the rejection.

Fernandez also argues that the ALJ erred by deciding that the depression was not a severe impairment and by improperly rejecting evidence from Dr. Vega and Dr. Martin. I agree. Fernandez is correct that at Step 2, a claimant is required to make only a *de minimis* showing of an impairment. *Hinkle v. Apfel*, 132 F.3d 1349 (10th Cir. 1997). There is some evidence indicating that Dr. Vega and Dr. Martin considered Fernandez's depression to be an issue that needed treatment and accommodation if he was to return to the workforce. Moreover, Dr. Vega appears to be a treating physician. The ALJ apparently rejected Dr. Vega's opinions about Fernandez's limitations without considering all the proper factors.

The Social Security Administration has developed a very structured analytical framework that an ALJ must follow when determining how much weight to give to any medical opinion. First, the ALJ must decide whether the opinion comes from a treating source. A treating source is either a physician or a psychologist who has an ongoing treatment relationship with the applicant. 20 C.F.R. § 404.1502. If so, then ALJ must determine whether the opinion is entitled to controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The Tenth Circuit has explicitly described how an ALJ must analyze a treating doctor's opinion:

> An ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. The agency ruling contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight.

*Id.* Even if a treating source opinion is not entitled to controlling weight, an ALJ cannot simply reject the opinion; it is still entitled to deference. *Id.* In order to determine how much deference, the ALJ must consider all of the following six factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Id.* at 1300-01; *see also* 20 C.F.R. §§ 404.1527(d)(2)-(6) & 416.927(d)(1)-(6)).

The ALJ's decision must always demonstrate consideration of the proper factors, *Robinson v. Barnhart*, 366 F.3d 1078 (10th Cir. 2004) (remanding because the ALJ's opinion failed to demonstrate that he considered the proper factors in determining what weight to give to a physician's opinion); *Nielson v. Sullivan*, 992 F.2d 1118, 1119-1120 (10th Cir. 1993) (noting that meaningful review requires that the ALJ articulate the basis for his decision with sufficient detail to allow a reviewing court to determine that he followed the appropriate legal principles); *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir.

1989) ("Where the record on appeal is unclear as to whether the ALJ applied the appropriate standard . . . the proper remedy is reversal and remand."). Moreover, the ALJ must also be sufficiently specific to make it clear to any subsequent reviewers what weight the ALJ gave to the treating source opinions and the reasons for that weight. *Watkins*, 350 F.3d at 1300. If the ALJ rejects the treating source opinion completely, he must give "specific, legitimate reasons" for doing so. *Id.*

The ALJ failed to identify several factors in his assessment of Dr. Vega's opinions and also did not provide an adequate basis for rejecting Dr. Martin's opinion regarding Fernandez's mental impairments. In particular, there is little recognition by the ALJ that these are both specialists in their field, that their evidence is consistent with each other and with other evidence in the record of Fernandez's difficulties with depression, and that Dr. Vega had an extended treatment relationship with Fernandez.

Accordingly, I must, with regret, remand this case to the Commissioner for essentially the same reasons as the two previous remands, specifically, for the ALJ to consider the 1996 FCE and the effects of Fernandez's mental impairments, including proper analysis of the opinions of the treating sources.

2.      Error in Assessing Credibility

In general, credibility determinations are the province of the fact finder, but nonetheless should be closely and affirmatively linked to substantial evidence. *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001) (as amended) (citation omitted). The Social Security rulings direct an ALJ to give reasons for a credibility finding that are supported by the record and are sufficiently specific to inform reviewers of the weight given to a

claimant's statements and the reason for that weight.  *See* Social Security Ruling 96-7p.

Because I will remand based on the errors in determining the RFC, I will not address Fernandez's arguments concerning credibility in detail.  However, I will note that it appears that the ALJ relied too much on selected bits and pieces of testimony from the three hearings that were somewhat inconsistent.  It is hardly surprising that Fernandez would have more limitations in 2006, after several additional surgeries, than he had in 1996.  Accordingly, as a general matter, on remand, the ALJ should consider the passage of time and intervening surgeries or other changes in Fernandez's condition when assessing his daily activities and the consistency of his testimony at the various hearings for the purposes of credibility determinations.

3.      <u>Hypothetical Questions to the VE</u>

Fernandez also argues that the ALJ's hypothetical questions to the VE were flawed because the RFC upon which they were based was not supported by the evidence.  I agree that the ALJ will need to obtain additional evidence concerning jobs available in the economy after properly determining Fernandez's RFC.

Conclusion

Based upon my review of the record in this case, I find that the ALJ failed to demonstrate that he considered the FCE or all of the proper factors regarding Dr. Martin

and Dr. Vega's opinions.  Accordingly, the determination that Fernandez is not disabled is reversed and this matter is remanded for proceedings consistent with this opinion.

DATED at Denver, Colorado, on August 31, 2007.

                                      BY THE COURT:

                                      s/ Walker D. Miller
                                      United States District Judge